**In the Matter of Charles J. JESSEN, Rhodetta K. Jessen, Engaged in Farming, Debtors.**

**Bankruptcy No. 87–1042–W.**

United States Bankruptcy Court, S.D. Iowa.

Jan. 29, 1988.

Charles L. Smith, Council Bluffs, Iowa, for debtors.

Steven H. Krohn, Council Bluffs, Iowa, for PCA and FLB.

Elizabeth A. Nelson, Des Moines, Iowa, Trustee.

Linda R. Reade, Asst. U.S. Atty., Des Moines, Iowa, for Government.

## ORDER

LEE M. JACKWIG, Chief Judge.

On July 8, 1987 the following matters came on for hearing in Council Bluffs, Iowa:

1. Motion to dismiss and/or to remove debtors as debtors in possession filed by the Production Credit Association of the Midlands (PCA) and the Federal Land Bank (FLB) on June 15, 1987;

2. Motion to segregate proceeds of CRP contract and CRP program and to prohibit debtors' use thereof filed by the PCA on June 15, 1987;

3. Motion to require trustee to investigate and initiate cause of action available to the estate and/or for order granting authority to creditor to initiate action on behalf of estate filed by the PCA and the FLB on June 19, 1987;

4. Resistances to the foregoing motions filed by the debtors on June 22, 1987; and

5. Motion to dismiss filed by the standing Chapter 12 trustee on July 2, 1987.

Charles L. Smith appeared on behalf of the debtors and Steven H. Krohn appeared on behalf of the PCA and FLB. Elizabeth A. Nelson, standing Chapter 12 trustee, was present. The case has been submitted on briefs, various documents and an investigation memorandum filed by the trustee.

## FACTS

1. The debtors' 1986 federal tax return shows the debtors received income from the following sources:

| Source | Amount |
| --- | --- |
| Wages | $35,256.00 |
| Interest Income | 758.00 |
| Sealing of Grain | 21,936.00 |
| Cash Payment | 2,981.00 |
| Cash Rent | 22,660.00 |
| Executor Fee | 1,975.00 |
| Total | $85,566.00 |

2. For twenty-four years prior to 1985, the debtors actively engaged in farming.

3. In order to supplement farm income, Charles Jessen obtained off-farm employment as a custodian in December of 1984.

4. Unable to obtain operating financing, the debtors leased much of their land on a cash rent basis in 1985 and 1986.

5. Approximately 280 acres remained uncultivated in 1986.

6. Earl Phippen, the uncle of Charles Jessen, died on July 10, 1985.

7. Earl Phippen's last will and testament was filed with the Iowa District Court for Audubon County on July 17, 1985.

8. In the will, Earl Phippen devised 160 acres of land located in Audubon County to Charles Jessen.

9. On April 7, 1986 Charles Jessen executed and filed a disclaimer to the 160 acres in the estate proceedings.

10. The debtors filed a petition for relief under Chapter 12 on April 17, 1987.

11. The trustee estimates that the value of the land less encumbrances is $33,-880.00.

## DISCUSSION

The PCA withdrew its motion concerning the CRP payments after the hearing. The remaining issues include: whether the debtors are eligible for Chapter 12 relief; whether Charles Jessen's disclaimer of the 160 acres and failure to cultivate 280 acres in 1986 are grounds for removal of the debtors as debtors in possession or for dismissal of the case; and whether Charles Jessen's disclaimer of the 160 acres is cause for the trustee or the PCA and the FLB to initiate an action on behalf of the estate to void the disclaimer pursuant to 11 U.S.C. section 544(b).

### A. *Chapter 12 Eligibility*

The PCA, the FLB and the trustee contend that the debtors are not eligible for Chapter 12 relief. Specifically, they argue that the cash rent is not derived from a "farming operation" and therefore the debtors do not satisfy the 50 percent income test set out in 11 U.S.C. section 101(17)(A). Further, the PCA and the FLB maintain that the income received from sealing corn should not be considered "gross income" for eligibility purposes.

11 U.S.C. section 109(f) states that "[o]nly a family farmer with regular income may be a debtor under Chapter 12 of this title." 11 U.S.C. section 101(17)(A), which defines "family farmer" in the context of an individual or individual and spouse, requires in part that:

[an] individual or individual and spouse engaged in a farming operation ... receive from such farming operation more than 50 percent of such individual's or such individual and spouse's gross income for the taxable year preceding the taxable year in which the case concerning such individual or such individual and spouse was filed;

A "farming operation" is defined in 11 U.S.C. section 101(20) as including "farming, tillage of the soil, dairy farming, ranching, production or raising of crops, poultry, or livestock, and production of poultry or livestock products in an unmanufactured state".

A number of cases have examined the meaning of "farming operation" in general and as it relates to the income test found in section 101(17)(A). This court in *Matter of Burke*, 81 B.R. 971 (Bankr.S.D.Iowa 1987) reviewed some of those cases and determined that the decisions generally have fallen along two lines. One line of cases, represented by *Matter of Armstrong*, 812 F.2d 1024 (7th Cir.1987), *cert. denied*, — U.S. —, 108 S.Ct. 287, 98 L.Ed.2d 248 (1987), views "farming operation" narrowly. For the *Armstrong* majority, a critical question is whether the activity under consideration exposes the debtor to the risks

inherent in agricultural production. The other line of cases interprets "farming operation" in a broader fashion. Those courts look to the "totality of the circumstances" in determining whether the debtors or the family members or relatives in the case of a corporation or partnership are engaged in farming and whether, in the case of an individual or an individual and spouse, the income test is met. This court adopted the latter approach in the *Burke* decision.

■ With respect to cash rent arrangements, this court stated:

Income received from a cash rent arrangement will be farm income in the case of an individual or individual and spouse only if the evidence reveals that past farming activities have been more than short term or sporadic and that any cessation of farming activities is temporary. Consideration will be given to the reason for the cessation (inability to obtain operating credit versus new nonfarm venture); the extent of the cessation (leasing a portion of the farm in an effort to scale back the operation versus leasing the entire farm); and the relationship to the tenant (leasing to family members as opposed to leasing to nonrelated individuals or entities).

*Burke,* at 976–77.

Under the totality of the circumstances, the debtors in this case have established that the cash rent is derived from a farming operation. The debtors had been actively engaged in farming for twenty-four years prior to curtailing their farming operation in 1985. Thus, their past farming activities cannot be characterized as short term or sporadic. The debtors ceased actively farming because they were unable to obtain operating credit. The fact that these debtors leased much of their farm and sold their equipment does not obviate finding the rent was from a "farming operation". The record reveals that the PCA cut off operating credit in December of 1984 and the debtors were unable to find operating credit elsewhere. Therefore, maintaining more than a small portion of the farm was an impossibility.

Finally, the record does not address the relationship between the cash rent tenants and the debtors. However, a finding for the debtors is warranted even if it is assumed the tenants were not related to the debtors. Apparently, the debtors have access to relatives' equipment and their son farms a portion of their land on a crop share basis. They cannot be viewed as having abandoned farming on a permanent basis. Under the facts of this case, finding that the cash rent is derived from a farming operation does not abuse the Congressional intent underlying 11 U.S.C. § 101(17)(A) in particular and Chapter 12 in general.

■ With respect to the $21,936.00 received from sealing grain, the PCA and the FLB argue the amount is really a loan and should not be included as "gross income" for purposes of the income test. Where appropriate, this court has utilized a tax law meaning of "gross income" in determining Chapter 12 eligibility. *Matter of Faber,* 78 B.R. 934 (Bankr.S.D.Iowa 1984). If a tax code approach were utilized in the present case the $21,936.00 would be deemed "gross income." This term is defined in the tax code as "all income from whatever source derived...." 26 U.S.C. section 61(a). Tax regulations provide that farmers using a cash method of accounting must include "all subsidy and conservation payments received which must be considered as income" in gross income for the taxable year. 26 C.F.R. section 1.61–4.

In this case the debtors reported the $21,936.00 as farm income from crop sales on Form 4835 of their 1986 tax returns. The proof of claim filed by the Commodity Credit Corporation shows only a 1987 advance deficiency in the amount of $1,539.56. There is no indication in the record that the agreement between the debtors and the CCC, which generated the proceeds in issue, matured other than before the petition date. Under the facts, the challenged amount is not a debt but rather is farm income. *Cf. In re Stedman,* 72 B.R. 49 (Bankr.D.N.D.1987) (indebtedness to the CCC was not reduced until the CCC received payment after the petition date

and therefore was included in debt calculation); *In re Carpenter,* 79 B.R. 316 (Bankr. S.D.Ohio 1987) (debts created by agreements between debtors and the CCC are not contingent and the impact of those agreements must be determined as of the petition date). Accordingly, the debtors have established that more than 50% of their income is derived from a farming operation in which they are engaged.

### B. *Gross Mismanagement*

The PCA and FLB maintain that the debtors should be removed as debtors in possession or that the case should be dismissed because a portion of the farm remained idle during 1986 and Charles disclaimed his inheritance. The PCA and FLB assert these actions constitute gross mismanagement.

■ 11 U.S.C. section 1204(a) provides that a debtor may be removed as a debtor in possession "for cause, including ... gross mismanagement of the affairs of the debtor, either before or after the commencement of the case". 11 U.S.C. section 1208(c)(1) states that a case may be dismissed for "gross mismanagement, by the debtor that is prejudicial to creditors". The PCA and FLB do not cite nor does the court find any cases that have examined the term "gross mismanagement" as used in sections 1204 and 1208. The legislative history of Chapter 12 and in particular, section 1204, indicates that Congress envisioned that a trustee would substitute for a removed debtor in possession and that this transfer of duties was modeled after provisions in Chapter 11. H.Conf.R. No. 958, 99th Cong., 2d Sess. 49, *reprinted in* 1986 U.S. CODE CONG. & ADMIN.NEWS 5227, 5246, 5250. 11 U.S.C. section 1104, which governs appointment of trustees in Chapter 11 cases, states in part:

(a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee—

(1) for cause, including ... gross mismanagement of the affairs of the debt-

or by current management, either before or after commencement of the case. . . .

Courts interpreting this provision have recognized that appointment of a trustee is an extraordinary remedy. *In re Loyd W. Ford,* 36 B.R. 501, 504 (Bankr.W.D.Ky. 1983); *In re Tyler,* 18 B.R. 574, 577 (Bankr. S.D.Fla.1982); *Matter of Anchorage Boat Sales, Inc.,* 4 B.R. 635, 644 (Bankr.E.D.N.Y.1980). Appointment of a trustee may prevent reorganization because the administrative expenses associated with the appointment are paid by the estate. *Id.* Accordingly, the parties seeking the appointment bear the burden of proving the appointment is justified. *In re General Oil Distributors, Inc.,* 42 B.R. 402, 408 (Bankr. E.D.N.Y.1984); *In re Crescent Beach Inn, Inc.,* 22 B.R. 155, 159 (Bankr.D.Me.1982). Use of a *gross* mismanagement standard implies a recognition that every bankruptcy reorganization involves some degree of mismanagement. *In re William A. Smith Const. Co., Inc.,* 77 B.R. 124, 126 (Bankr.N.D.Ohio 1987).

Given the clarity of the legislative history, the similarity of the language used in sections 1104 and 1204 and the financial burdens that accompany having a trustee operate a farm, the court concludes that the aforementioned principles apply in a Chapter 12 context.

■ Under these standards, the PCA and the FLB fail to shoulder their burden. With respect to the uncultivated land, the evidence is clear that the debtors were unable to farm because of a lack of operating credit. Moreover, they attempted to rent the land. A prospective tenant was lined up but he eventually declined to lease the land because of the dispute between the debtors and the FLB. There is little more the debtors could have done to ensure that the land was cultivated. The fact that land remained idle was not the result of gross mismanagement.

■ Likewise, Charles' decision not to disclaim his inheritance does not constitute "gross mismanagement." The disclaimer was made pursuant to Iowa Code section

633.704(1). Under Iowa law, a disclaimer takes effect against creditors. *Seeley v. Seeley,* 242 Iowa 220, 45 N.W.2d 881, 884 (1951). Contrary to the PCA's and FLB's contention, Charles had no obligation to accept the inheritance and apply it to debt.

■ The court's findings concerning "gross mismanagement" as used in section 1204 applies to "gross mismanagement" as used in section 1208(c)(1).[1] Generally in rehabilitation cases, the burden of proof in a motion to dismiss rests with the moving party. *In re Sheehan,* 58 B.R. 296, 299 (Bankr.D.S.D.1986) (party moving to dismiss under 11 U.S.C. 1112(b) bears burden of proof); *In re Morton,* 43 B.R. 215, 220 (Bankr.E.D.N.Y.1984) (motion to dismiss in Chapter 13 case denied because of creditor's failure to offer proof that mortgage payments were not being made). As discussed above, the PCA and FLB have failed to carry this burden.

### C. *Fraudulent Transfer*

The PCA and the FLB moved the court to require the trustee to investigate and to initiate a fraudulent transfer action to recover the disclaimed inheritance under 11 U.S.C. section 544(b).[2] In the alternative, the PCA and FLB requested that they be given the authority to initiate such an action. At the July 8, 1987 hearing, the court directed the trustee to investigate the disclaimer and to file a report with the court. On August 10, 1987 the trustee submitted a report and served counsel for the debtor and for the PCA and the FLB. She concluded that there was no legal support for pursuing a fraudulent conveyance action under either 11 U.S.C. section 544(b) or section 548. The trustee's statement of facts and discussion of pertinent law are sound.

### CONCLUSION AND ORDER

WHEREFORE, for the reasons expressed above, the court finds that: (1) the debtors satisfy the 50 percent income test of 11 U.S.C. section 101(17)(A) and therefore are eligible for Chapter 12 relief; (2) Charles Jessen's disclaimer of his inheritance and failure to cultivate 280 acres of land do not constitute gross mismanagement under 11 U.S.C. sections 1204 and 1208; and (3) Charles Jessen's disclaimer of 160 acres is not cause for the trustee to initiate a fraudulent conveyance action under 11 U.S.C. section 544(b).

THEREFORE, the motions to dismiss, the motion to remove debtors as debtors in possession, and the motion to require trustee to investigate and initiate cause of action available to the estate and/or for order granting authority to creditor to initiate action on behalf of estate are denied.

IT IS FURTHER ORDERED that the debtors file and properly serve their Chapter 12 plan by February 19, 1988 and that the preliminary hearing on the plan be scheduled during the March assignment in Council Bluffs, Iowa.

---

1. The term "gross mismanagement" does not appear as a specific ground for dismissal in the nonexclusive lists in 11 U.S.C. sections 1112(b) and 1307(c).

2. 11 U.S.C. section 544(b) states:

The trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.